FRANCO MEOGROSSI                                                                    PLAINTIFF

V.                                                                    NO. 3:09cv-00301-JDM

COLONEL JOHN AUBREY,
Jefferson County Sheriff

AND

RICHARD WILKERSON,
Deputy Jefferson County Sheriff                                        DEFENDANTS

## MEMORANDUM OPINION

Both defendants have filed motions for summary judgment of the plaintiff's claims

against them in this action. Having considered the motions, all replies and responses thereto, and

the evidence presented, the court will grant the defendants' requests with respect to some, but

not all, of plaintiff's claims against them.

## I.

This litigation involves Mr. Franco Meogrossi's attempted re-sale of a pass, and Deputy

Richard Wilkerson's subsequent confiscation of tickets and passes, issued by Churchill Downs.

The asking price for the pass Mr. Meogrossi attempted to sell was just $200, so if the confiscated

tickets and passes were for a low-stakes race day in June, the parties likely would have resolved

the matter themselves, or perhaps deemed it not worth arguing about in the larger scheme of

things. The confiscated tickets and passes were for the 2008 Kentucky Derby, however, and Mr.

Meogrossi had paid $3,400 for them and driven all the way from New York to see the Derby for

the first time. So, when Deputy Sheriff Richard Wilkerson confiscated Mr. Meogrossi's Derby

tickets and passes after he attempted to sell an Oaks day pass to a food and drink tent, it became

very much worth arguing about to Mr. Meogrossi, and he eventually sought judicial assistance in resolving his dispute.

**A.**

The parties do not disagree about the following facts. The plaintiff, Franco Meogrossi lives in New York. In 2008, he became interested in attending this city's famed race, and purchased a package of tickets directly from Churchill Downs. For $4,800 he received four Oaks seat tickets and four Derby seat tickets, plus eight so-called "Marquee Village" passes that accompanied the seat tickets. The face value of each Oaks ticket was $350. The face value of each Derby seat ticket was $850. The Marquee Village passes had no face value, but gave the holder access to a restricted-access food and drink area within Churchill Downs, that also had betting booths, and screens to view coverage of the races available.

On Thursday, May 1, 2008 (the day before the Oaks), Mr. Meogrossi, his wife,[1] her mother, and one of his cousins drove from New York to Kentucky to attend the Derby. Although Mr. Meogrossi had purchased Oaks tickets, he and his companions were too tired to enjoy the Oaks after a long drive the day prior. Mr. Meogrossi had already anticipated this would be the case, however, so he tried to sell the Oaks tickets and passes via eBay before he left New York. He was partially successful. The Oaks seat tickets sold, but only for $105 (a price well below their face value of $350), and he was unable to sell online the companion Marquee Village passes. Accordingly, by the time he arrived in Kentucky, he had four passes to the Marquee Village on Oaks day, four Derby Tickets, and four passes to the Marquee Village on

---

[1]Mr. Meogrossi is not married to this woman, but has been her partner for years, and considers her a "common law wife." Because the precise nature of Mr. Meogrossi's marital status is utterly irrelevant to the determination of the issues before the court, and because Mr. Meogrossi consistently referred to this woman as his wife during his deposition, the court will use Mr. Meogrossi's chosen term.

Derby day.

While his family rested in their hotel room on the morning of the Oaks, Mr. Meogrossi drove to the area near Churchill Downs to attempt to sell his four Marquee Village passes for Oaks day. He also brought with him his package of Derby seat tickets and passes, too, instead of leaving them with his companions. There was nothing wrong with his doing so, but the decision soon proved regrettable.

At about 11:00 a.m. on Oaks day 2008, Jefferson County Deputy Sheriff Richard Wilkerson encountered Mr. Meogrossi, who was standing near an entrance to Churchill Downs. The two men's versions of the encounter differ, but neither disputes that Deputy Wilkerson was working in plain clothes and off-duty from the Jefferson County Sheriff's Department (but with their approval). Deputy Wilkerson was employed that day by a civilian contractor hired to provide security near the track, and was paired with another off-duty officer who was moonlighting from the Louisville Corrections Department. No testimony from that officer has been included in the record, however.

Deputy Wilkerson carried his badge issued by the Sheriff's Department, and thought he had the authority to "do whatever a normal police officer would do" (*e.g.,* issue citations, make arrests, investigate suspected criminal activity). His specific duties, as assigned by the civilian security contractor, were to look for underage drinkers and ticket scalpers.

On the morning he encountered Deputy Wilkerson, Mr. Meogrossi was trying to re-sell the Marquee Village passes that accompanied his Oaks seat tickets. None of the passes had any price or value printed on them, but Mr. Meogrossi testified that, since he paid $350 for each seat ticket plus Village pass, and re-sold the seat ticket for $105, that he believed $200 was a

reasonable price to request for each pass. He testified that he had been told by a representative of Churchill Downs that the passes permitted independent admission to the track (albeit without a seat), and entitled the bearer to unlimited food and beverages in the "Village" during the race day, plus access to betting booths within the Village. So, by his way of thinking, since he had paid $350 for both the seat ticket and the pass, but had only received $105 for the seat ticket, $200 was still less than what he had paid Churchill Downs for both the seat ticket and pass. He sold three passes for his asking price of $200 near the entrance of Churchill Downs on the morning of the Oaks and had only one remaining by 11:00 a.m.

With respect to what happened next, there is some difference in testimony. Mr. Meogrossi testified that Deputy Wilkerson approached him and asked whether he had tickets for sale, and that he responded that he only had one and showed him the Marquee Village pass. Deputy Wilkerson testified that Mr. Meogrossi initiated the discussion by waving several tickets in front of Deputy Wilkerson and asking whether he wanted to buy any. They both agree, however, that Mr. Meogrossi eventually offered to sell Deputy Wilkerson one Marquee Village pass, which had no price printed on its face, for $200, and that in response Deputy Wilkerson flashed his badge and accused Mr. Meogrossi of scalping.

According to Mr. Meogrossi, Deputy Wilkerson then took the Marquis Village pass, and asked him whether he had any other tickets. Mr. Meogrossi testified that he interpreted the question as an inquiry about whether he had any other tickets he was trying to sell, and thus answered "no," because the four Derby tickets and Village passes in his back pocket were for his personal use. Deputy Wilkerson admitted during his deposition that Mr. Meogrossi never offered to sell him the Derby Tickets or accompanying passes, but testified that he was very

-4-

clear in repeatedly asking whether Mr. Meogrossi had any other tickets on his person at all, because it was his professional experience that scalpers are not deterred by mere encounters with the police and will often just turn over the specific tickets they have been accused of scalping, then go to another nearby area and try to scalp anything they have left.

Deputy Wilkerson testified that he next "performed a *Terry* search to make sure he had no weapons right before the confrontation or right after the initial confrontation." This court has no idea why Deputy Wilkerson felt the need to pat down Mr. Meogrossi in search of weapons. Deputy Wilkerson never testified that it was his professional experience that ticket scalpers typically carry weapons, or that scalpers often are physically aggressive or dangerous when confronted by the police. There is not any other evidence in the record that would suggest that a pat-down for weapons was a commonplace or reasonable activity for a police officer to perform when investigating a suspected scalper at a very public venue. Nor is there any evidence that Mr. Meogrossi exhibited any aggressive or threatening behavior, or that Deputy Wilkerson or his partner for the day had any independent reason to be concerned that Mr. Meogrossi might have or use a weapon concealed on his person. And, finally, there is no testimony that Deputy Wilkerson intended to arrest Mr. Meogrossi and take him into custody. Nevertheless, Deputy Wilkerson determined that he needed to search Mr. Meogrossi for weapons, patted him down, and discovered the four Derby seat tickets and corresponding Marquis Village passes in Mr. Meogrossi's back pocket.[2] Annoyed by what he perceived to be a lie, and in spite of Mr. Meogrossi clarifying that he interpreted Deputy Wilkerson's question about other tickets as

---

[2]Deputy Wilkerson testified that Mr. Meogrossi's Derby tickets and passes were sticking out of his back pocket. Mr. Meogrossi testified that the tickets were in his back pocket, but did not mention whether they were visible. They both agree that Deputy Wilkerson did not discover the tickets until he frisked Mr. Meogrossi.

pertaining only to additional tickets for sale, not those he had reserved for personal use, Deputy Wilkerson confiscated Mr. Meogrossi's Derby tickets and Marquee Village passes in addition to the one Oaks Marquee Village pass that he had attempted to sell.

Deputy Wilkerson then offered Mr. Meogrossi a choice: Mr. Meogrossi could just walk away or be issued a citation. Either way, all of the tickets, even the ones intended for Mr. Meogrossi's personal use, would be confiscated. At Mr. Meogrossi's insistence, Deputy Wilkerson issued a criminal citation, which notes that, in addition to the pass offered for sale, eight more tickets were found in Mr. Meogrossi's pocket. Deputy Wilkerson did not indicate on the citation that the eight additional tickets were for the Derby the next day, or that four were seat tickets and four Marquee Village passes.

Deputy Wilkerson testified that issuing a citation was a rare occurrence for him in general, and that on the day in question he had confiscated fifty to one hundred tickets, but Mr. Meogrossi was the only person he accused of scalping who had asked to be cited. Deputy Wilkerson did not find this sufficiently unusual to warrant any further investigation of Mr. Meogrossi's claims that the tickets were for his personal use, though.

Despondent, Mr. Meogrossi returned to his hotel room. Upon hearing the news, his wife obtained Deputy Wilkerson's telephone number from the Sheriff's Department and requested the return of the tickets. He refused. She then called the Sheriff's Department and asked them to intervene. They also refused.

As for what became of the tickets, that is unclear. After the Derby they had no economic value, but did for at least part of the time they were in Deputy Wilkerson's custody. Mr. Meogrossi suggests that Deputy Wilkerson may have used or sold the tickets himself. There is

no evidence in the record to support this theory, however.

Deputy Wilkerson testified that he clipped the confiscated tickets to a copy of Mr. Meogrossi's citation and left them in his car. According to Deputy Wilkerson, he intended to take the tickets and citation to the Internal Affairs office of the Sheriff's Department, but knew that office was closed on Oaks day and during the weekend, so he waited until Monday and turned them in then. There is no documentary evidence in the record to support his testimony, such as a chain of custody document that indicates when the tickets were placed in evidence and when they were removed from evidence. Deputy Wilkerson asserts that he did not remove the tickets from the evidence room until meeting with the County Attorney, who asked Deputy Wilkerson to bring the tickets to be copied in preparation for Mr. Meogrossi's hearing. At the hearing, the charges were dismissed because Deputy Wilkerson did not appear.[3] The tickets and passes no longer exist: Deputy Wilkerson testified he destroyed the tickets after the charges were dismissed.

## II.

Mr. Meogrossi subsequently filed suit against Deputy Wilkerson and Jefferson County Sheriff John Aubrey in their individual capacities. Although Mr. Meogrossi also sued both men in their official capacities, he did not name the Louisville Metropolitan Government as an additional defendant.[4] Mr. Meogrossi alleges claims under federal law and several state law

---

[3]Deputy Wilkerson testified that his failure to appear was due only to an inadvertent administrative error.

[4]In 2003 two formerly separate political entities, the City of Louisville and Jefferson County merged and formed the Louisville Metropolitan Government. The new entity then merged the formerly separate city and county police departments and created the Louisville Metropolitan Police Department. The Jefferson County's Sheriff's Department, which had always been a separate entity, did not merge

continue...

causes of action. He also seeks punitive damages.

Specifically, Mr. Meogrossi alleged in his complaint that Deputy Wilkerson, acting under color of law, violated his rights under the Fourth Amendment by subjecting him to an unreasonable search and seizure in violation of 42 U.S.C. § 1983, and that Sheriff Aubrey, although not a participant in the search and seizure, is responsible under 42 U.S.C. § 1983 for failing to adequately train and supervise his deputies. Mr. Meogrossi further claimed that both defendants are guilty of the torts of conversion, malicious prosecution, defamation, and interference with a prospective contract.

Following the close of discovery, Mr. Meogrossi conceded that the evidence does not support any finding of individual liability on Sheriff Aubrey's part, but asserts that a finding of official liability is proper pursuant to the doctrines of respondeat superior and vicarious liability, and pursuant to Kentucky Revised Statute 70.040, which he argues waives any immunity Sheriff Aubrey may otherwise have. Mr. Meogrossi also conceded that the evidence does not support his allegations that either defendant defamed him. Accordingly the potentially viable claims that remain are:

> 1. 42 U.S.C. § 1983
>> A. Unlawful Search and Seizure (Deputy Wilkerson)
>> B. Failure to Train (Sheriff Aubrey)
> 2. Conversion
> 3. Malicious Prosecution

---

[4]...continue
with the police departments, however. Although it is now a department of the Louisville Metropolitan Government, it retains its former name.

4.  Interference with Contractual Relations

5.  Fraud, Oppression, or Malice Warranting Punitive Damages

Each of these is brought against Deputy Wilkerson in both his official and individual capacities, and against Sheriff Aubrey in his official capacity only.

Both defendants have filed motions for summary judgment asserting that plaintiff's claims all fail as a matter of law.  In addition, both defendants assert  immunity defenses.  The court will now evaluate whether the defendants' motions should be granted in whole or in part.

### III.

Summary judgment as a matter of law is proper only where there exists no *genuine* issue of *material* fact.  FED. R. CIV. P. 56(c)(emphasis added).  In considering a motion for summary judgment, this court must construe the evidence and draw all reasonable inferences in favor of the non-moving party (in this case, Mr. Meogrossi),  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The party bearing the burden of proof on a particular issue – regardless of whether he is the movant or non-movant – cannot rely on mere allegations or conclusory statements, however. *See Maki v. Laako*, 88 F.3d 361, 364 (1996).  Rather, that party must point to in the record, or proffer, actual evidence to support his claims.  *Id.*  What's more, the evidence proffered  must fit within certain parameters.  It must be "of an evidentiary quality [*i.e.,* capable of being admitted at any trial of the matter] that demonstrates the existence of a genuine issue of material fact." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)(emphasis and bracketed

explanation added).  To be of evidentiary quality, "[t]he proffered evidence need not be in admissible form, but its content must be admissible."  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)(emphasis in original omitted)).

With this in mind, the court will now evaluate each claim against the defendants.

## A.     42 U.S.C. §1983

Section 1983 of Title 42 of the United States Code creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere.  As such, it has two basic requirements:  (1) the plaintiff must establish that he was deprived of federal statutory or constitutional rights by (2) a person acting under color of state law.  *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).  Mr. Meogrossi alleges that Deputy Wilkerson deprived him of his rights under the Fourth Amendment by subjecting him to an unreasonable search of his person and an unreasonable seizure of his tickets and passes to Churchill Downs.   He further alleges that Sheriff Aubrey is liable for creating the conditions that led to Deputy Wilkerson's violation of the Fourth Amendment, specifically by failing to train his employees regarding the constitutionally proper procedure for conducting a warrantless search and for seizing putative evidence.

### 1.     Qualified Immunity

As a preliminary matter, both defendants asserted the defense of qualified immunity under federal law.  Qualified immunity is a defense only to individual capacity claims.  Because Mr. Meogrossi conceded that the evidence does not support any claims against Sheriff Aubrey in his individual capacity, any qualified immunity to be had would extend only to the individual liability claims against Deputy Wilkerson.

Whether qualified immunity applies to an official's conduct is a question of law, but "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004)(internal citation omitted). "Thus, to the extent that there is disagreement about the facts," the court "must review the evidence in the light most favorable to the Plaintiff[ ], taking all inferences in [his] favor," *id.*, and determine whether a reasonable finder of fact could determine that the alleged tort or violation of law occurred. The court will therefore determine first whether any of Mr. Meogrossi's federal claims survive summary judgment and, if so, evaluate then whether any qualified immunity exists.

### 2. Individual Capacity Claim Against Deputy Wilkerson

The Supreme Court declared that those who "carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it," are acting under color of state law. *Hafer v. Melo*, 502 U.S. 21, 28 (1991). The first prong of Mr. Meogrossi's §1983 claim is therefore satisfied. The next question is whether there exists sufficient evidence that he was deprived of his rights under the Fourth Amendment, as he alleges.

The facts presented could, when viewed in the light most favorable to Mr. Meogrossi, support his claim that Deputy Wilkerson violated his rights under the Fourth Amendment. There are two components to this claim, however, the pat-down search of his person and the seizure of the Derby tickets and passes discovered during the search.

### a. The Pat-Down Search

Deputy Wilkerson testified that he patted down Mr. Meogrossi to search for weapons,

but there is no evidence or testimony that would support any reasonable suspicion that Mr. Meogrossi was armed or dangerous. Deputy Wilkerson's pat-down search therefore violated the Fourth Amendment. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005).

A generalized underlying concern for officer safety "permits a variety of police responses" to those they have detained, including performing pat-down searches "upon reasonable suspicion that [the detainee] may be armed and dangerous." *Id.* (internal citations omitted). "A lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Id.* (citing *Terry*, 392 U.S. at 27 ("Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual ...")). Consequently, "[t]o justify a pat-down search, the officers must articulate specific facts that would warrant 'a reasonably prudent man in the circumstances .... in the belief that his safety or that of others was in danger.'" *Id.* (citing *Terry*, 392 U.S. at 27)).

Deputy Wilkerson proffered no facts at all to support any concern for his safety, the safety of his partner for the day, or the safety of the Churchill Downs patrons in the area. Nor, as noted in the facts section above, did he testify that it was his professional experience that ticket scalpers commonly are armed or respond with physical violence when confronted by the police. On the contrary, Deputy Wilkerson testified that his professional experience was that scalpers tended to be rather cavalier about being caught, and would simply move farther away and resume business. Accordingly, and viewing the evidence in the light most favorable to the Mr. Meogrossi, the court finds that there exists sufficient facts demonstrating that Deputy Wilkerson

violated Mr. Meogrossi's Fourth Amendment rights when he conducted a pat-down search.

### b. The Seizure of Mr. Meogrossi's Tickets and Passes

Viewed in the light most favorable to Mr. Meogrossi, there exists sufficient evidence for a finder of fact to concludes that the Derby tickets and passes Mr. Meogrossi intended for personal use would not have been discovered had he not been subjected to an unconstitutional frisk. One could argue that the seizure of the tickets and passes was derivatively unconstitutional, as well. Regardless of whether that argument would have legal merit in the context of a §1983 claim, the court will evaluate whether the seizure would have been unconstitutional even if the tickets and passes were lawfully discovered.

Any seizure of personal property generally requires probable cause. Bennett, 410 F.3d at 825 (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). However, the Supreme Court "has recognized that some *brief* detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are 'minimally intrusive.'" *Id.* at 825 (citing *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543-44 (6th Cir. 2002) (emphasis added)). In *Farm Labor*, the case relied upon in *Bennett*, the Sixth Circuit explained that "'seizures of personal effects when based on anything less than probable cause' are permitted only to the extent that they satisfy the standards for reasonableness applicable to '*Terry*-type investigative detentions.'" *Farm Labor*, 308 F.3d at 544 (quoting *United States v. Saperstein*, 723 F.2d 1221, 1231 (6th Cir.1983)).

"This *Terry*-like inquiry for determining whether a seizure based upon less than probable cause is constitutional involves two steps." *Bennett*, 410 F.3d at 825. "First, the Court must determine whether the detaining officer has a reasonable and articulable suspicion that the

property he wishes to seize is connected with criminal activity, and second, the scope of the seizure must be reasonable, both in duration and in intrusiveness." *Id.* (internal citations omitted).

Following *Bennett*, this court will engage in the *Farm Labor* analysis to determine whether the warrantless seizure of Mr. Meogrossi's Derby tickets and passes was constitutional. Assuming that the Deputy Wilkerson had reasonable suspicion to believe that, in spite of Mr. Meogrossi's repeated protests to the contrary, Mr. Meogrossi never intended to sell his Derby tickets and passes, much less scalp them, the *Farm Labor* analysis also requires the court to determine whether Deputy Wilkerson's seizure of those tickets and passes "was sufficiently limited in time and whether the investigative means were the least intrusive." *Bennett*, 410 F3d at 826.

The Supreme Court has noted that "in determining whether a Fourth Amendment violation has occurred, it is necessary to balance the government interest in the temporary seizure against the individual's interest in avoiding the intrusion." *Id.* at 826 (citing *United States v. Place*, 462 U.S. 696, 709 (1983)). Thus, "[i]n looking to the permissible time limitation for a seizure based on less than probable cause, the Supreme Court has not adopted a per se time limitation, but rather has 'emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *Id.* (citing *United States v. Sharpe,* 470 U.S. 675, 685 (1985)).

In *Farm Labor*, the Sixth Circuit found the seizure of motorists' green cards for four days to be unconstitutionally unreasonable, because "only one day or less was needed for the officer to contact and receive verification from the INS as to the card's authenticity." *Farm Labor*, 308

F.3d at 546-47.   There is no indication that Deputy Wilkerson ever investigated, however

briefly, whether Mr. Meogrossi might have been telling the truth about the Derby tickets and

passes.  Although the seizure occurred in the immediate vicinity of the main gate to Churchill

Downs, and although Deputy Wilkerson was employed by the track's security contractor, he did

not bother to check whether Mr. Meogrossi was, in fact, the out-of-state owner of the tickets and

passes.  This information alone would not have conclusively established that it was patently

unreasonable for Deputy Wilkerson to believe that Mr. Meogrossi might have scalped tickets, if

permitted to keep them.  But, when combined with Mr. Meogrossi's concurrent protestations that

he told Deputy Wilkerson he had no more tickets on his person because he intended the seized

tickets only for personal use, plus Mr. Meogrossi's and his wife's repeated attempts to plead

with Deputy Wilkerson directly, the Sheriff's Department and with Churchill Downs (all of

which Deputy Wilkerson testified he was aware), and Deputy Wilkerson's admission that, of all

the persons Deputy Wilkerson accused of scalping that day, Mr. Meogrossi was the *only* one

who insisted on being cited to create a record of what was seized, a jury might be inclined to

believe that modicum of further investigation would have been reasonable and that any failure to

do so was unconstitutional under the circumstances.   For, it is "appropriate to examine whether

the police diligently pursued a means of investigation that was likely to confirm or dispel their

suspicions quickly, during which time it was necessary to detain the defendant" or his property.

*Sharpe*, 470 U.S. at 686.                    .

In addition, "'[T]he *brevity of the invasion* of the individual's Fourth Amendment

interests' is key in determining whether a seizure can be justified on reasonable suspicion,"

*Bennett*, 410 F.3d at 827 (citing *Sharpe*, 470 U.S. at 686)(emphasis added), because the length of

the detention of personal property is a "flexible concept" that must be evaluated no only in light of the needs of law enforcement, but also as "the time reasonably needed to effectuate those purposes." *Id*.

In seizing Mr. Meogrossi's tickets and retaining them beyond Derby day, without conducting event the briefest inquiry when presented with an atypical response, Deputy Wilkerson "essentially reversed the onus under the Fourth Amendment and placed the burden on [Mr. Meogrossi] to demonstrate that [the tickets were in fact his and that he had not lied about their intended use], whereas the burden, under the Fourth Amendment, is on law enforcement to justify its intrusions." *Id.* " *It* is not up to individuals to demonstrate the absence of criminal activity; rather, it is up to law enforcement, if they have appropriate suspicions, to investigate and confirm or dispel those suspicions." *Id.* Because there exists sufficient evidence in the record to permit a jury to find that Deputy Wilkerson's seizure of the tickets constituted a Fourth Amendment violation independent of the unconstitutional search, the court will not grant summary judgment in Deputy Wilkerson's favor with respect to any part of Mr. Meogrossi's individual capacity § 1983 claim against him.

### c.     Qualified Immunity

Government officials, including law enforcement officers, are immune from civil liability for claims made in their individual capacities unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir.2006). Unless "the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly

established," a defendant sued in his individual capacity is entitled to qualified immunity on summary judgment. *Aldini v. Johnson,* 609 F.3d 858, 863 (6th Cir. 2010)

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006). "A right is 'clearly established' for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been held unlawful." *Smoak v. Hall,* 460 F.3d 768, 777 -78 (6th Cir. 2006). "The relevant inquiry is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As will discussed *supra*, the court finds that there exists sufficient evidence to permit a reasonable juror to find that Deputy Wilkerson violated Mr. Meogrossi's Fourth Amendment rights when he conducted a warrantless pat-down search and seized putative evidence he found. The court further finds that it would have been clear to a reasonable officer that, under the circumstances attendant to Deputy Wilkerson's interaction with Mr. Meogrossi, that his conduct was unlawful. *See Bennet,* 410 F.3d 810. Consequently, the court will not enter an order declaring that Deputy Wilkerson is entitled to qualified immunity from Mr. Meogrossi's § 1983 claim.

### 2.      Official Capacity Claims

It is well established that the officers and employees of a municipality (such as the Louisville Metropolitan Government) may be held liable under 42 U.S.C. § 1983. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). If an action is brought

against an official of a government entity in that person's official capacity, however, the suit is properly construed as being brought against the governmental entity itself, not the named individual. *See Monell,* 436 U.S. at 691 n. 55; *Bush v. Rausch*, 38 F.3d at 849. Because the Jefferson County Sheriff's Department is a department of the Louisville Metropolitan Government, Mr. Meogrossi's official-capacity claims against the defendants are thus properly construed as claims against Louisville Metropolitan Government. *See Monell*, 436 U.S. at 694 and *Smallwood v. Jefferson County Government*, 743 F. Supp. 502, 503 (1990)(concluding that, although a § 1983 complaint named the Jefferson County Fiscal Court and the Jefferson County Judge Executive as defendants sued in their official capacities, there was really only one defendant – Jefferson County).

A municipality or other local government may be liable under 42. U.S.C. § 1983, but only for its own illegal acts. *Thompson v. Connick*, __ S. Ct. __, 2011 WL 1119022, *6 (2011)(citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 692 (1978)). There is no basis for liability due merely to the theories of *respondeat superior* or vicarious liability. *See Monell*, 436 U.S. at 691-95. Instead, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (citing *Monell*, 436 U.S. at 691)).

### 1.    Failure to Intervene

Mr. Meogrossi's assertion that Sheriff Aubrey is liable under § 1983 because his department failed to intervene, as requested, on Oaks and Derby day 2008, fails as a matter of law because  "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th

2006)(citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir.1999)). "Rather, the supervisors must have actively engaged in unconstitutional behavior." *Id.* "Therefore, liability must lie upon more than a mere right to control employees and cannot rely on simple negligence." *Id.*

## 2. Failure to Train

Mr. Meogrossi also asserts, however, that Sheriff Aubrey failed to train his deputies in the constitutionally appropriate way to conduct warrantless searches and seizures, which led to Deputy Wilkerson's violation of his Fourth Amendment rights. Deputy Wilkerson testified that he received no formal training regarding the constitutional parameters for conducting warrantless searches and seizing evidence. He did, however, state that there was a manual, which he was required to read and learn as a Sheriff's Deputy. There is no evidence that the contents of the manual were inaccurate or deficient, but neither is there any evidence that the Sheriff's Department took any steps to ensure that deputies actually read and understood the manual, or that they were regularly briefed on significant updates to the law.

The court takes judicial notice that the Jefferson County Sheriff and his employees are principally responsible for collecting property taxes, serving summonses and process documents, providing security for Jefferson County courtrooms, and conducting auto inspections.[5] Even the Sheriff's Department's "Criminal Division" is primarily occupied with service of process, auto inspections, and evictions,[6] not with what a layperson would understand to be typical police duties (*e.g.,* the investigation of alleged crimes and the enforcement of the law). Nevertheless,

---

[5]*See* http://www.jcsoky.org.

[6]*See id.* ("Criminal Unit – The Jefferson County Sheriff's Office is responsible for the expedient service/execution of all court ordered documents directed to the Sheriff of Jefferson County. Deputies assigned to the Units of Process, EPO/Warrants, Evictions/Executions and Vehicle Inspections provide this service.)

some Sheriff's deputies do serve as school resource officers where there would be at least a predictable, even if perhaps only occasional, need to investigate allegations of criminal activity and to collect evidence, and all deputies have the authority to enforce the law and to make arrests if necessary. Consequently, it is clearly withing the realm of reasonable necessity for Jefferson County Sheriff's Department deputies to be familiar with the legally permissible way to investigate an alleged crime, conduct any necessary searches, and seize any evidence.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* at *7. Only when the failure to train amounts to "deliberate indifference" on behalf of the city toward its inhabitants, however, will failure to train lead to city liability under § 1983. *City of Canton v. Harris,* 489 U.S. 378, 389 (1989). As the Supreme Court explained in *Canton*:

> The issue ... is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Id. at 390 (footnotes omitted).

The Supreme Court recently cautioned, however, that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 2011

WL 1119022 at *7 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell ")).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (internal citations omitted). Thus, when a municipality is "on actual or constructive notice that a particular omission in [its] training program causes city employees to violate citizens' constitutional rights, the [municipality] may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* As the Supreme Court has repeatedly observed, "[a] less stringent standard of fault for a failure-to-train claim 'would result in de facto respondeat superior liability on municipalities ... .'" *Id.* (citing *Canton*, 489 U.S. at 392).

Some evidence of a pattern of similar constitutional violations by improperly trained employees typically is necessary to establish deliberate indifference for purposes of a failure to train claim. *Id.* Mr. Meogrossi has no such evidence. This is not to say, however, that his claim is necessarily foreclosed.

In *Canton* , the Supreme Court left open the possibility that a pattern of similar violations might not be necessary to show deliberate indifference. That being said, the Court has also cautioned that the possibility is open only in a "narrow range of circumstances." *Connick*, 2011 WL 1119022 at *8 (citations omitted). In *Canton,*

> The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that

situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Connick,* 2011 WL 1119022 at *8 (internal citations omitted).

Mr. Meogrossi's case is distinguishable from the example given in *Canton,* in that the real-world consequence (*i.e.,* death) of a failure to train police officers regarding the constitutional parameters of the use of deadly force is much more extreme and, arguably predictable, than the failure to train Jefferson County Sheriff's deputies, the majority of whom are not principally tasked with investigating crimes, with the constitutional parameters of conducting a warrantless search or seizure. It is similar, though, in that there is no reason to assume that Jefferson County Sheriff's Department applicants are familiar with the limitations of the Fourth Amendment (regardless of whether Deputy Wilkerson may actually have had some), or that novice deputies would be able to obtain the legal knowledge they require in the absence of training.

Moreover, there is evidence of some training (*e.g.,* a manual that deputies are expected to read), and this court is mindful of the Supreme Court's admonition that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392; *accord Connick*, 2011 WL 20119022 at *10. Arguably, merely providing a manual and directing employees to read it, is not the best way to ensure that Jefferson County Sherriff's deputies have an adequate knowledge of the constitutional constraints on their duties, "[b]ut failure-to-train liability is concerned with the substance of the training, not the particular

instructional format.  The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."  *Connick*, 2011 WL 20119022 at *10.

On the other hand, a jury could find that merely distributing a manual, and nothing more, is the functional equivalent of no training at all, and that there was an obvious and predictable need for even Sheriff's deputies to know how to properly conduct a warrantless search or seizure of evidence.  Whether the evidence ultimately presented at trial will indicate that the training provided by the Sheriff's Department was more extensive, and arguably more adequate, than that described by Deputy Wilkerson during his testimony, remains to be seen.  If it does, it is unlikely that this claim will survive a request for a directed verdict.  For the moment, however, the Supreme Court's analysis in *Canton,* and the extant evidence viewed in the light most favorable to Mr. Meogrossi, permits it to survive a request for summary judgment.

This court will therefore grant summary judgment of Mr. Meogrossi's official capacity claim against Sheriff Aubrey for his alleged failure to act, but will otherwise deny all requests for summary judgment of the remaining federal claims against both defendants.

### B.    State Law Claims

Mr. Meogrossi also asserted various state law claims against Deputy Wilkerson in his official and individual capacities.  Those that remain following his concession that there is no evidence of defamation, are claims of the tort of conversion, the tort of malicious prosecution, and the tort of intentional interference with contractual relations.  He also asserts that punitive damages are warranted.

Mr. Meogrossi further asserts that Sheriff Aubrey is liable for these state law claims in his official capacity, too.  Unlike his federal claim, Mr. Meogrossi does not assert an independent claim

of failure to train. Rather, he argues that Sheriff Aubrey is derivatively liable for each of the torts allegedly committed by Deputy Wilkerson, pursuant to statutory waiver and under the theories of either *respondeat superior* or vicarious liability.

## 1. Individual Capacity

### a. Conversion

The tort of conversion is an intentional tort and Kentucky case law states that the following elements are necessary to prove conversion:

(1)     the plaintiff had legal title to the converted property;

(2)     the plaintiff had possession of the property or the right to possess it at the time of the conversion;

(3)     the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;

(4)     the defendant intended to interfere with the plaintiff's possession;

(5)     the plaintiff made some demand for the property's return which the defendant refused;

(6)     the defendant's act was the legal cause of the plaintiff's loss of the property; and

(7)     the plaintiff suffered damage by the loss of the property.

*Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005). Of these elements, the only one that is not either conclusively established by the evidence or at least supported by enough evidence to preclude summary judgment, is the third. And, with respect to the third element, it seems clear that Deputy Wilkerson exercised dominion over the tickets and passes and prevented Mr. Meogrossi's use and enjoyment of them. There is no evidence,

however, that the confiscated tickets and passes were intended for, or were in some manner used by Deputy Wilkerson for his own benefit or enjoyment.

It appears peculiar that there appears to be no documentary evidence of any chain of custody establishing when Deputy Wilkerson purportedly entered the seized tickets and passes into evidence, whether he entered the actual tickets and passes (as opposed to mere photocopies that could have been made at any time) into evidence, when Deputy Wilkerson removed the tickets and passes from evidence, or when he allegedly destroyed them. Thus, and without casting aspersions on Deputy Wilkerson, it is not surprising that Mr. Meogrossi, who was already feeling wronged, suspected that Deputy Wilkerson used or sold the tickets himself. Suspicion is not proof, however.

There is no testimony from the officer working with Deputy Wilkerson on Oaks day, no testimony or payroll evidence from his employer, or anything else in the record that proffers anything more than suspicion to refute Deputy Wilkerson's description of what happened to the Derby tickets and the passes once Deputy Wilkerson seized them. Without some proof tending to create a question of fact, Deputy Wilkerson's testimony (made under oath and with no countervailing evidence establishing or suggesting perjury) stands unchallenged. The court will therefore grant summary judgment in Deputy Wilkerson's favor with respect to this claim.

### b.    Malicious Prosecution

In Kentucky, there are six necessary elements of the tort of malicious prosecution. They are:

> (1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings

,

> (2) by, or at the instance, of the plaintiff,

> (3) the termination of such proceedings in defendant's favor,

(4) malice in the institution of such proceeding,

(5) want or lack of probable cause for the proceeding, and

(6) the suffering of damage as a result of the proceeding.

*Raine v. Drasin,* 621 S.W.2d 895, 899 (Ky. 1981)(citations omitted).  There is no dispute that Deputy Wilkerson issued a criminal citation to Mr. Meogrossi and that the criminal charges against him were later dismissed when Deputy Wilkerson did not appear at the scheduled hearing.  Nor is there any dispute that Mr. Meogrossi lost the use of the tickets confiscated by Deputy Wilkerson when he issued the citation and that Mr. Meogrossi incurred legal fees for defending the charges against him.  Accordingly, of the six elements of the tort of malicious prosecution, only the fourth (malice in the institution of the proceeding) and the fifth (lack of probable cause) warrant evaluation and further discussion.

The elements of malice and lack of probable cause are intertwined.  Malice may be active, hostile, and demonstrable, in the sense of the defendant's desire to inflict harm or suffering on the plaintiff, but need not be so to qualify as an element of this tort.  Rather, malice may also be presumed from a "want of probable cause." *Sweeney v. Howard,* 447 S.W.2d 865, 866 (Ky. 1969).

Because malice can be inferred from a lack of probable cause, and because probable cause is also a necessary element of the tort, the court will first evaluate whether probable cause existed for Deputy Wilkerson's issuance of the citation to Mr. Meogrossi.  If probable cause did exist, there can be no presumed malice, and any evidence of actual malice becomes irrelevant.

The plaintiff has the burden of "making a clear showing that no probable cause for the prosecution existed." *Puckett v. Clark*, 410 S.W.2d 154, 157 (Ky. 1966).  And, whether certain

facts[7] constitute probable cause is a question of law for this court. *Sweeney*, 447 S.W.2d at 866; *Hendrie v. Perkins*, 42 S.W.2d 502, 504-505 (Ky. 1931).

Probable cause "means such ground as would induce a man of ordinary prudence to believe that the person prosecuted had committed the crime charged." *Louisville & N. R. Co. v. Sharp,* 140 S.W.2d 383, 385 (Ky. 1940). The crime with which Mr. Meogrossi was charged was ticket scalping.

> A person is guilty of ticket scalping when he intentionally sells or offers to sell a ticket to an ***event*** at a price greater than that charged at the place of admission or printed on the ticket, unless authorized by the issuer or by law.

Ky. Rev. Stat. 518.070(1)(emphasis added). "Event" means "a ***sports contest*** or ***other public performance*** to which the general public is not admitted without consideration." Ky. Rev. Stat. 518.010(2)(emphasis added). "Sports contest" means "any professional or amateur sport, athletic game or contest, or race or contest involving machines, persons, animals, or objects that is viewed by the public." Ky. Rev. Stat. 518.010(4). And, "public performance" means "any form of entertainment other than a sports contest involving machines, persons, animals, or objects that is viewed by the public." Ky. Rev. Stat. 518.010(3).

The only ticket Mr. Meogrossi attempted to sell to Deputy Wilkerson was a Marquee Village pass. According to Mr. Meogrossi, a representative of Churchill Downs had informed him that the pass, although intended as a companion benefit to a purchaser of a seat ticket, would permit independent entry to the track and entitle its bearer to watch the races without benefit of a seat and to use the betting booths in the Marquee Village area. The court therefore concludes that the pass was a ticket to an event, as that term is defined by statute.

---

[7]At trial, it would be the province of the jury to determine whether certain facts had been proven. Because this court is considering a motion for summary judgment, however, it need only construe the facts in evidence in the light most favorable to the non-movant, which in this case is Mr. Meogrossi.

The next question is whether a person of ordinary prudence would have concluded that, in requesting $200 for the pass, Mr. Meogrossi was attempting to sell the pass "at a price greater than that charged at the place of admission or printed on the ticket" without authorization from the issuer or by law. Ky. Rev. Stat. 518.070(1). The undisputed evidence is that there was no price printed on the face of the pass. The evidence is also undisputed that Churchill Downs did not sell Marquee Village passes independently of seat tickets, but rather included them as a package benefit when certain seats were purchased, but there is no evidence that this fact was something a reasonable purchaser on the street would have or should have known.

With respect to whether the resale, regardless of price, was conducted with authorization by Churchill Downs, or in accordance with law, there is also no evidence that a reasonable person would have, or should have known, that Churchill Downs allegedly authorized Mr. Meogrossi to resell the pass, whether Churchill Downs assigned any specific dollar value to the pass, or that the value Mr. Meogrossi assigned it was less that he paid for both it and the seat ticket, minus the amount he recouped from the sale of the seat ticket on eBay. It was merely an official looking pass with no price specified anywhere on it for which $200 was the re-sell price requested.

That $200 "ask price" was greater than the amount (none) specified on the pass. Churchill Downs did not charge a separate price for any Marquee Village passes, or sell them individually. And there is not sufficient evidence that Churchill Downs consented, or at least stated no objection to, any re-sale of the passes for the amount of $200. Accordingly, the court concludes that Deputy Wilkerson had probable cause to accuse Mr. Meogrossi of scalping the pass and to issue a citation

for a violation of Ky. Rev. Stat. 518.070.[8]

### c. Improper Interference with Contractual Relations

### (1) Whether This Claim Survives Summary Judgment

One who, without a privilege to do so, induces or purposely causes a third person not to perform a contract with another is liable to the other for the harm caused thereby. *See Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky.1988)(concluding, *inter alia*, that the Restatement of Torts §§766 and 767 fairly reflect the prevailing law of Kentucky); *see also* Rest. 2d Torts §766. The party seeking recovery bears the burden of proving that the opposing party "improperly" interfered with his contract. *Id.* at 858.

As a preliminary matter, Deputy Wilkerson asserts that there was no interference with contractual relations, because the confiscation of the Derby tickets and passes merely prevented Mr. Meogrossi from using them, and the contract between Mr. Meogrossi and Churchill Downs was fully performed when Mr. Meogrossi paid for his tickets and received possession of them. That formalistic argument strains credulity. Churchill Downs' contractual obligations were not simply to send Mr. Meogrossi tickets for which he had paid. Rather, in exchange for Mr. Meogrossi's payment in full for the tickets and passes, Churchill Downs was contractually obligated not only to issue the tickets and passes to him, but *also* to permit the bearers' admission to Churchill Downs and the Marquee Village area when they presented the tickets and passes on the days indicated thereon. When Deputy Wilkerson confiscated Mr. Meogrossi's Derby tickets and passes and retained them

---

[8]To be clear, whether Deputy Wilkerson had probable cause to issue a citation for ticket scalping with respect to the Oaks day Marquee Village pass, which is the only relevant inquiry regarding the allegations of malicious prosecution, does not determine whether Deputy Wilkerson had probable cause to search for and seize the Derby tickets and passes Mr. Meogrossi had reserved for personal use. That is a separate inquiry.

in his possession until the Monday following the 2008 Derby, he most certainly interfered with the performance of those contracts to Mr. Meogrossi's detriment.

Interference with a contract is an intentional tort, however, so it is not enough that Deputy Wilkerson actually interfered with Mr. Meogrossi's contracts with Churchill Downs.[9]  Rather, Mr. Meogrossi must show that Deputy Wilkerson's interference with his contractual relations "was either desired by [Deputy Wilkerson] or known by him to be a substantially certain result of his conduct."  Rest. 2d Torts §767, cmt. d.  After reviewing the evidence in the record, the court feels confident in saying that exists sufficient evidence to permit a finder of fact to conclude that Deputy Wilkerson knew that his confiscation of Mr. Meogrossi's tickets and passes would prevent Mr. Meogrossi (or anyone else for that matter) from using them to attend the Derby the next day.  After all, and by his own testimony, that was his stated purpose in seizing them.

Deputy Wilkerson's interference was clearly intentional, but that does not end the court's inquiry.  The court must now determine whether it was also improper.

Restatement (Second) of Torts § 767 sets forth seven factors to consider when evaluating whether a person's alleged interference with contract was improper.[10]  At a minimum, however, "a

---

[9]It is for this reason, that the court respectfully disagrees with Deputy Wilkerson's assertion that any refusal to grant summary judgment of this claim would mean that "a ticket buyer could conceivably sue any third party whom [*sic*] interfered (directly or indirectly) with his ability to attend an event."  None of the entries in Deputy Wilkerson's parade of horribles (the traffic jam, the illness inadvertently acquired, the transmission of incorrect information about an event's date and time) described *intentional* interference, only negligent or accidental interference.

[10]"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:  (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."  Rest. (2d) Torts § 767.

continue...

party seeking recovery must show malice or some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859. But, "just as malice may be inferred from a lack of probable cause in a malicious prosecution action, malice may be inferred in an interference action by proof of lack of justification." *Id.* (internal citations omitted).

The court has already determined that the evidence supports a conclusion that Deputy Wilkerson did not have any legal justification to pat down Mr. Meogrossi under the circumstances of their encounter. Viewed in the light most favorable to Mr. Meogrossi, the evidence could also support a determination that, had Deputy Wilkerson not frisked Mr. Meogrossi for weapons, he would not have discovered and confiscated the Derby tickets and passes in Mr. Meogrossi's back pocket. The evidence could also support a conclusion that the seized tickets and passes were retained for a time too long under the circumstances to pass constitutional muster. Accordingly, a finder of fact could also conclude that, whether Deputy Wilkerson actually bore any actual ill will toward Mr. Meogrossi or harbored any desire to harm him economically, he used his authority as an officer of the law to conduct an unconstitutional search and seizure of evidence, and thereby deprived Mr. Meogrossi of the value of his Derby tickets and passes by preventing him from using them.

The court therefore concludes that there exists sufficient evidence that Deputy Wilkerson lacked justification for his interference with Mr. Meogrossi's contracts. Consequently, the court will deny Deputy Wilkerson's request for summary judgment of this claim in his favor.

---

[10]...continue

**(2)    Whether Deputy Wilkerson is Entitled to Qualified Official Immunity**

As discussed above, public employees enjoy only qualified official immunity from state law claims when they are sued in their individual capacities.  This type of immunity "applies to the *negligent* performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)(emphasis added).  As such it only affords protection from "damages liability for good faith judgment calls made in a legally uncertain environment. " *Id.* (internal citations omitted).  "[A] finding of 'bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known ... or if the officer or employee willfully or maliciously intended to harm the plaintiff....'" *Id.* at 523 (citations omitted).

Mr. Meogrossi has accused Deputy Wilkerson of committing *intentional* torts, not acting negligently.    Because the facts viewed in the light most favorable to Mr. Meogrossi indicate that there exists a genuine issue of material fact with claim of intentional interference with contract the finder of fact could determine that sufficient facts exist to support a determination that Deputy Wilkerson's actions were taken in bad faith for purposes of any qualified immunity under Kentucky law.  Moreover, when viewed in the light most favorable to Mr. Meogrossi, the facts indicate that there was no legally uncertain environment.  The factual cornerstone of Mr. Meogrossi's interference with contract claim is Deputy Wilkerson's unconstitutional search and seizure.  Had that violation not occurred, Mr. Meogrossi would not have been prevented from using the Derby tickets and passes for which he had paid.  For these reasons, the court cannot declare that Deputy Wilkerson

is entitled to qualified official immunity with respect to this alleged tort.

## 2. Official Capacity Claims

Mr. Meogrossi has also sued Deputy Wilkerson and Sheriff Aubrey in their official capacities. Qualified immunity, which they have asserted in the context of the individual capacity claims, does not apply to official capacity claims. This is not to say that no doctrine of immunity is potentially applicable.

Kentucky's highest court has declared that the doctrine of sovereign immunity "precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Yanero,* 65 S.W.3d at 517; *see also Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). "Governmental immunity is derived from sovereign immunity and applies to tort liability of governmental agencies." *Cross*, 260 S.W.3d at 345. For this reason, "a state agency is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function." *Id.* (citing *Yanero*, 65 S.W.3d at 519). By extension, "[o]fficial immunity protects governmental officials or employees from tort liability for performance of their governmental [*i.e.,* discretionary] functions" and "official immunity is absolute when an official's or an employee's actions are subject to suit in his official capacity." *Id.* (citing *Yanero*, 65 S.W.3d at 521).

Because the Louisville Metropolitan Government is a political subdivision of the state, it is enjoys governmental immunity. *Id.* (citing *Lexington-Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128 (Ky.2004)). The Jefferson County Sheriff's Department is a department of the Louisville Metropolitan Government. Consequently, absent a waiver thereof, a sheriff and his deputies, as county officials, have "absolute official immunity at common law for torts ... when sued

in [their] official capacit[ies]." *Id.* (*citing Yanero*, 65 S.W.3d at 517).

A few years ago, however, the Kentucky Supreme Court determined whether Kentucky Revised Statute 70.040 waives a sheriff's absolute official immunity for any tortious acts or omissions of his deputies. *See id.* Kentucky Revised Statute 70.040 states:

> The sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section. When a deputy sheriff omits to act or acts in such a way as to render his principal responsible, and the latter discharges such responsibility, the deputy shall be liable to the principal for all damages and costs which are caused by the deputy's act or omission.

When evaluating the statute's scope, the Kentucky Supreme Court first observed that a "literal or plain reading of the statute clearly imposes liability on the sheriff in his official capacity for acts committed by his deputies." *Id.* at 346. Then, after observing that "statutes in derogation of the state's sovereign immunity will be strictly construed in favor of the state unless the intention of the legislature to do otherwise is clearly expressed in the statute," the court nonetheless concluded that "the legislative waiver of immunity is very clear, and that the plain language of KRS 70.040 leaves no room for any other reasonable construction than a waiver of the sheriff's official immunity (the office of sheriff) for the tortious acts or omissions of his deputies." *Id.* (internal citations omitted).

Sheriff Aubrey attempts to distinguish the holding in *Jones* from the facts of this case by arguing that in *Jones* the alleged torts were committed by a Sheriff's deputy who was on duty, as opposed to moonlighting as Deputy Wilkerson was. According to Sheriff Aubrey, Ky. Rev. Stat. 70.040 does not impose liability on the office of the Sheriff for the unofficial acts of those he employs, and Deputy Wilkerson's actions were not the official actions of a Sheriff's deputy because (1) Deputy Wilkerson was working off-duty for a civilian contractor and (2) if Deputy Wilkerson's

actions were in fact unlawful, then they were not within the scope of his official duties.

The court does not find these arguments persuasive. This is not the case of a Sheriff's deputy allegedly violating laws and committing torts unrelated to his employment as a deputy (*e.g.,* smoking marijuana or trespassing while on a hunting trip). Off-duty or not, Deputy Wilkerson was moonlighting with the permission of the Sheriff's department and, more importantly, was hired to perform law enforcement duties. He carried, and used, the badge of the Jefferson County Sheriff's department when he accused Mr. Meogrossi of scalping, detained him, searched his person, seized putative evidence, issued a criminal citation, and delivered the evidence seized to the Sheriff's Department's evidence locker. These are official acts that he could not have taken merely as Richard Wilkerson, private citizen. Accordingly, the court finds that, under Kentucky precedent, the Sheriff's Department does not enjoy immunity from Mr. Meogrossi's official capacity state-law claims against Sheriff Aubrey or Deputy Wilkerson.

### 3. Mr. Meogrossi's Request for Punitive Damages

Mr. Meogrossi has requested punitive damages. Although neither defendant has specifically argued that the request should be dismissed, they each have asserted that all claims that potentially could support a punitive damages award should be summarily adjudicated in their favor.

In Kentucky, the recovery of punitive damages are governed by KRS § 411.184. *See Stewart v. Estate of Cooper*, 102 S.W.3d 913, 915-16 (Ky.2003). Whether the facts presented at trial will convince the finder of fact that punitive damages are warranted, the court cannot say. Given that summary judgment of the claim of intentional interference with contract has been denied, however, the court will decline to dismiss the request for punitive damages at this juncture.

-35-

# IV.

This court suspects that after reviewing this opinion both defendants may experience feelings of exasperation and be less than fully sympathetic to the continued viability of Mr. Meogrossi's allegations of wrongdoing, because any wrongs that might have occurred did not result in the deprivation of life, or liberty, or even of property more valuable than Derby tickets and passes.

True, the consequences of the acts alleged by Mr. Meogrossi are relatively minor, in the larger scheme of cases typically adjudicated in federal courts.[11]  Yet, although the actual consequences of the alleged violations are relatively small in comparison to those this court typically sees, the *wrongs* alleged are by no means insignificant and, regardless, the courts of the United States exist to permit the justiciable redress of wrongs,  regardless of their perceived comparative significance.  There is no *de minimis* exception to § 1983 liability:  any alleged violation of a citizen's rights under the Fourth Amendment warrants serious review and should not be tolerated absent significantly meritorious countervailing governmental interests.  Moreover, the principles that apply to the intentional interference with a contract apply regardless of whether the value of the contract was five hundred or five million dollars.

Accordingly, this court will enter an order consistent with this memorandum opinion that grants in part and denies in part the defendants' requests for summary judgment.

DATE:


cc:     counsel of record

---

[11]This is not to disparage the amount of financial losses Mr. Meogrossi experienced.  It is the rare person for whom the mere price paid for the tickets Deputy Wilkerson confiscated would not represent a significant financial loss, and Mr. Meogrossi incurred travel and legal fees, too.